ROUNDS & PORTER LUMBER COMPANY v. BURNS.

4-8979                                        225 S. W. 2d 1

Opinion delivered December 19, 1949.

*Alvin S. Buzbee, Edward L. Wright* and *J. Wirth Sargent,* for appellant.

*Aubert Martin* and *DuVal Purkins,* for appellee.

GEORGE ROSE SMITH, J. The appellant is a Kansas corporation that owns about thirty retail lumber yards in Kansas and Oklahoma. This suit was filed by the appellee to hold the appellant liable for failure to account for lumber valued at $8,000. The defense is that the appellee's cause of action is against another corporation, the Taylor Oak Flooring Company. The chancellor found that the appellant had so dominated and controlled the

Flooring Company that the separate entities of the two corporations should be disregarded. The appellee recovered judgment for $5,830.76, and this appeal followed.

The events leading to this suit extend over a period of about nine months, beginning in October of 1947 and ending in the following July. The appellee was the owner of real property on which there was stored rough and finished lumber worth $12,000. On October 22 he leased the land to Manning Taylor. By the terms of the lease the lessee became the lessor's agent to sell the finished lumber and to process and sell the rough lumber. The lessee agreed to account to the appellee for the proceeds of sale, with certain deductions for the lessee's services. The appellee contends that a full accounting has not been made, and the trial court upheld his view.

It is shown that Taylor, a young man under thirty, was not financially able to pay the rentals under the lease or to undertake the task of processing the lumber. In the month of December he interested the appellant in organizing the Taylor Oak Flooring Company to take over the lease and to enter the business of manufacturing flooring. Half the capital stock was issued to Taylor (partly in his wife's name), in return for which he assigned the lease to the new corporation and contributed machinery and equipment. For the other half of the stock the appellant contributed its check for $30,000. It is argued that Ralph M. Rounds, president of the appellant, was actually the original stockholder, but we think the trial court was justified in concluding that the corporation in fact subscribed the stock. The appellant is a closely held family corporation, and the stock was not issued to Rounds individually until March 12. The corporation, however, had paid the money almost three months earlier, and it is shown that the agreement to incorporate listed the corporation as the original stockholder.

The Flooring Company was in financial difficulties almost from the day it began business. Taylor, who was the company's general manager, withdrew various sums from the corporate treasury, for which he gave promis-

sory notes of doubtful value. When an audit was made as of April 30, it was shown that operations to that date had resulted in a loss of almost $29,000 and that in addition Taylor owed the company about $21,500. Even so the company was apparently still solvent, having begun business with assets valued at $60,000. Had the company been liquidated at once it appears that its creditors would have been paid but that the stockholders would have lost the greater part of their investment.

On May 11, after the audit had been made, the corporate directors met and in effect surrendered control of the company to the appellant. Mrs. Taylor resigned as a director and was replaced by R. W. Elliott, one of appellant's employees. Taylor resigned as general manager and was succeeded by Elliott. Taylor's stock was pledged to the company to secure his indebtedness. While Taylor continued as a director he does not appear to have attended subsequent meetings. Also on May 11 the appellant advanced $35,000 to the Flooring Company and took as security a blanket chattel mortgage on all its assets. The result of the May 11 directors' meeting was that the officers and employees of the appellant assumed the control and management of the Flooring Company.

Now of course a parent corporation is not liable for the debts of its subsidiary merely because the parent holds the controlling interest or because the two are managed by the same officers. *Lange* v. *Burke,* 69 Ark. 85, 61 S. W. 165; Powell, Parent and Subsidiary Corporations, § 6 (a, b). It is only when the privilege of transacting business in corporate form has been illegally abused to the injury of a third person that the corporate entities should be disregarded. Powell, *supra,* § 3. One of the surest indications of such abuse, however, is the fact that the executives of the subsidiary, instead of acting independently in its interest, take their orders from the parent corporation in the latter's interest. *Ibid.,* § 6 (j). As we said in the *Lange* case, *supra,* the directors cannot lawfully manage the affairs of one of the corporations in the interest of the other.

In this case the evidence shows pretty clearly that after May 11 the affairs of the Flooring Company were conducted in subservience to the interests of appellant. It is undisputed that flooring was sold to the appellant at a substantially lower price than that charged in sales to third persons. Appellant attempts to explain this favored treatment by differences in the quality of the flooring, but there is ample evidence that this was not the reason for the reduced price. Charlene Kight, an office employee of the Flooring Company, testified that the grade was the same. She further said that a regular price list was used in making sales to outsiders, but when sales were made to appellant the prices were given to her. The new general manager, Elliott, although a former employee of the appellant, resigned within two months. In a letter he explained his resignation: ''It became evident to me after two months here that at the prices for flooring, at which I am required to sell to the Rounds & Porter Lumber Company, I can neither make a profit nor pay off any creditors and for that reason I protested to the Rounds and Porter Company and resigned.''

When we compare the subsidiary's financial condition on the date appellant took control with its condition when it voluntarily petitioned for a reorganization in bankruptcy on July 24, we find convincing evidence of fraud. It is well known that unsecured creditors must rely primarily upon current liquid assets for the safety of their claims, since the value of fixed assets ordinarily shrinks in the slow process of converting them into cash. As Graham and Katz put it in their book, Accounting in Law Practice (2d Ed.), § 229: ''The greater the proportion of current assets composing .. . . net worth, the more sure is the position of the creditor. The greater the proportion of fixed assets, the more likely is it that the process of realization will be slow and subjected to a large risk of shrinkage in values.''

According to the audit of April 30—the basis on which the appellant ousted Taylor and assumed control— the principal liquid assets were lumber and flooring valued at $52,000, in round numbers. Part of this lumber

and flooring was in storage, and the warehouse receipts were pledged to the appellant's bank in Wichita, Kansas, to secure advances exceeding $29,000. The bank was the only secured creditor. A large number of the unsecured creditors were lumber dealers, whose accounts came to a total of about $40,000. Thus when the appellant advanced $35,000 on May 11 the subsidiary's liquid position was far from hopeless, and, as we have seen, the concern was solvent.

After appellant had controlled its subsidiary for less than two months the picture had changed completely. The balance sheet of June 30, which was attached to the bankruptcy petition, shows that only $11,000 worth of lumber and flooring was still on hand. Of course the bank had been paid, as the pledged warehouse receipts had to be redeemed to make the stored lumber available; but the unsecured creditors had not similarly profited by the appellant's management. On the contrary, the lumber dealers' accounts had risen from $40,000 to over $54,000.

Other liquid assets had also decreased. The subsidiary's accounts receivable dropped from $1,200 on April 30 to $400 on June 30. On the latter date the balance sheet showed about $3,600 in the bank and $29.52 in petty cash. When the bankruptcy petition was signed twenty days later the appellant's secretary stated on oath that the petitioner had no cash at all.

The chancellor was justified in concluding that during its two months of control the appellant stripped the Flooring Company of its liquid assets. In this process at least $55,000 worth of lumber and flooring ($41,000 of the original inventory plus $14,000 later bought on credit) had been sold—apparently at a loss, since the company's financial position declined to actual insolvency. Not only was the appellant the principal purchaser of this flooring; it was paying a price substantially less than that paid by third persons. Finally, the appellant emerged as the only secured creditor, with a mortgage on fixed assets valued at $81,000 on June 30. In the bankruptcy petition it proposed an arrangement by

which the unsecured creditors would receive between fifteen and twenty per cent on their claims.

We think the evidence supports the chancellor's conclusion that the appellant wrongfully manipulated the Flooring Company to its own advantage, at the expense of the appellee. Under the principles already stated, this conduct entitles the appellee to a judgment directly against the parent corporation, without regard to the separate entity of the subsidiary.

Affirmed.