**HENDERSON et al. v. ROUNDS & PORTER LUMBER CO.**

**Civ. 505.**

United States District Court
W. D. Arkansas, El Dorado D.

Aug. 2, 1951.

DuVal L. Purkins, Warren, Ark., for plaintiff.

H. S. Yocum, of Mahony & Yocum, El Dorado, Ark., J. Wirth Sargent, of Jochems, Sargent & Blaes, Wichita, Kan., for defendant.

JOHN E. MILLER, District Judge.

Detailed findings of fact and conclusions of law, separately stated, have been filed in this case, but the court feels in deference to the able attorneys for the respective parties that they are entitled to be apprised of the reasons that prompted the court's conclusions of law. Only those facts necessary to a reasonably clear presentation of the issues will be repeated here.

This action was originally commenced in the Chancery Court of Bradley County, Arkansas, by the plaintiffs, George H. Henderson and J. T. Haley, Jr., the latter being Trustee in Bankruptcy of the Taylor Oak Flooring Company. In their complaint it is alleged that the plaintiff, Henderson, had sold certain quantities of lumber to Manning Taylor and the Taylor Oak Flooring Company for which he had not been paid in full; that the Taylor Oak Flooring Company was duly adjudicated bankrupt, and plaintiff, J. T. Haley, Jr., appointed Trustee; and that the estate of the Oak Flooring Company is about to be closed, and there will be no money for the payment of the claims of common creditors, of which plaintiff, Henderson, is one. Plaintiffs seek to place liability for the unpaid balance directly upon the defendant, alleging "as a result of the fraud of Rounds and Porter Lumber Company in the domination and manipulations of the affairs of Taylor Oak Flooring Company, its agency, and converting all of its current assets, both money and lumber, to its own use, Rounds and Porter Lumber Company should be held to account".

Defendant removed the case to this court, upon grounds of diversity of citizenship and jurisdictional amount, and thereafter filed a motion to quash service. Service was had under the appropriate Arkansas "doing business" statute, and it appearing that the disposition of the motion would entail a full hearing and development of facts, later to be duplicated at the trial if the motion to quash was overruled, the court postponed disposition of the motion until the trial on the merits. Thereafter defendant answered, reasserting its motion to quash, alleging that the complaint failed to state a claim upon which relief could be granted and denying the material allegations of the complaint.

Subsequently the court permitted W. C. Partee and Chrystelle Partee, partners, d/b/a Partee Lumber Company, R. S. Foster, T. S. Grayson and J. B. Lee, partners, d/b/a Foster-Grayson Lumber Company, and J. T. Haley, Jr., Trustee in Bankruptcy,

on behalf of all common creditors, to intervene as parties plaintiff, and are hereinafter designated as plaintiffs. These plaintiffs likewise seek to place liability directly upon the defendant, Rounds and Porter Lumber Company. Defendant's answer to their complaint is essentially the same as that filed to the original complaint.

Defendant is a Kansas corporation owned by Ralph M. Rounds, his wife, and two sons. It and its subsidiaries, Rounds and Porter Company, the wholesale department, and Rounds and Palmer, a Texas corporation, operated seven wholesale and thirty retail lumber yards during the period here involved. In December, 1947, Ralph M. Rounds, President of the defendant, agreed with Manning Taylor, of Warren, Arkansas, to form a corporation for the manufacture of Oak Flooring. Mr. Rounds furnished $30,000 in cash and Taylor furnished machinery and equipment valued approximately at $30,000. For their contributions, each received 50%, or 300 shares, of the capital stock. It was disputed whether Ralph M. Rounds individually or the defendant, Rounds and Porter Lumber Company, was the stockholder, but from the evidence the court has found that the defendant was the actual owner of the stock. Ralph M. Rounds was elected President of the new corporation, W. O. Palmer Vice President, Roy W. Elliott Assistant to the President (all of the preceding being officers in the defendant company), Manning Taylor Secretary-Treasurer and General Manager, and Charlene Kight Assistant Secretary. It was agreed from the beginning that Taylor Oak Flooring Company (hereinafter referred to as Flooring Company) would sell its product to the defendant at the prices listed by the E. L. Bruce Company, referred to as Bruce's Price List. These prices were consistently $20 to $40 below the prevailing market price during the period involved.

The Flooring Company was in financial trouble from the beginning. Various factors contributed to this result. Manning Taylor remained as General Manager with authority to issue checks until May 11, 1948, when he resigned under pressure. By that time he had drawn checks aggregating $17,296.19 on the Flooring Company's funds. Part of this included checks written to himself covering equipment already owned by the corporation, and part of it included funds used for the payment of personal obligations. For this sum he gave notes and pledged 210 shares of his stock as security. The other 90 shares of his stock were transferred to one Murray B. McLeod to cover a personal indebtedness to the latter. In addition considerable trouble was experienced with the equipment. However, from all the evidence, the court has found that the principal and determinative factor in the failure of the Flooring Company was the practice of selling lumber to defendant at a loss. During the entire period of its operation defendant purchased 827,606 feet of lumber and paid therefor $76,442.92, whereas all others purchased 720,383 feet and paid therefor $132,868.62.

During this period there was a critical shortage of hardwood flooring. The Flooring Company was not permitted to take advantage of the abnormally high market price, at times referred to at the trial as "gray market" price, but actually the result of an overwhelming demand and a limited supply. It appears that defendant's purpose from the beginning and during the entire course of the transactions involved was to obtain for itself a supply of hardwood lumber at low prices. It should be added that in addition to the profit realized from the purchase at below market prices, defendant made the usual retail profit, variously estimated at from 25% to 50%, on sales through its retail outlets.

While Manning Taylor was occupying the position of General Manager defendant exercised close supervision of the Flooring Company. Roy W. Elliott, Treasurer of defendant, and Assistant to the President of the Flooring Company, visited Warren and supervised the setting up of the books. Defendant's auditors made periodic checks of the records. Manning Taylor was called in to explain the application by him of the funds hereinbefore mentioned, of which defendant was fully advised. And, although it had such knowledge, including the fact that the Flooring

Company was steadily losing money, it continued its practice of purchasing flooring at prices below the cost of manufacture. After Taylor's resignation in May, 1948, Roy W. Elliott took over as General Manager. Mr. Elliott apparently made an effort to straighten things out, but was unable to do so, and after two months resigned. In a letter to a creditor concerning his resignation, he commented: "It became evident to me after two months here that at the prices for flooring, at which I am required to sell to the Rounds and Porter Lumber Company, I can neither make a profit nor pay off any creditors. And for that reason, I protested to the Rounds and Porter Lumber Company and resigned." Elliott went to the Flooring Company under an agreement with defendant that he would remain on defendant's payroll while there. Ralph M. Rounds later repudiated this agreement and cut Elliott off, after which, for this and other reasons, Elliott resigned. Calvin Johnson, another employee of defendant, followed Elliott as General Manager and continued as such until involuntary bankruptcy proceedings were instituted in August, 1948.

On June 8, 1948, defendant and the Flooring Company entered into a contract whereby defendant would purchase air dried rough oak lumber and furnish it to the Flooring Company. The latter would manufacture the same into flooring and sell it to defendant at Bruce prices, less 5% and 2% discounts and the cost of the rough lumber to defendant. Thereafter operations were conducted under this agreement, but the Flooring Company was not permitted to make a profit and its loss continued at the same rate as it was when the rough lumber was purchased in its name. Its total expenses in handling and manufacturing the lumber exceeded the price at which it was required to sell to defendant, both before and after the contract of June 8, 1948. It appears that this agreement was suggested by Murray B. McLeod, who, after having acquired the 90 shares of stock from Manning Taylor, had been made a director on March 12, 1948. In this regard, it is interesting to note that later Mr.

McLeod also purchased flooring at Bruce prices.

In addition to the original $30,000, defendant made various advances or loans to the Flooring Company. On January 7, 1948, defendant loaned $10,000 as additional operating capital and shortly thereafter paid for a Ross Carrier which cost $6,829.49. Later, on May 11, 1948, defendant loaned the Flooring Company $35,000. The latter sum was principally used to retire certain bank overdrafts and notes, the major portion of which were with the Fourth National Bank of Wichita, Kansas, which were made with the assurance of Mr. Rounds, also a director in the bank, that the bank wouldn't lose any money.

On June 16, 1948, Mr. W. O. Palmer, then Secretary and later President of the defendant, wrote Mr. Elliott at Warren that the time had arrived when Mr. Rounds should get something in return for his investment in the Flooring Company, stating, "The best and quickest way to do this would be to take a retail profit on the production of the Taylor Oak Flooring Company." That same day he sent out a communication to all wholesale warehouses operated by defendant, advising, "In the future we are going to adopt a plan of distribution on oak flooring which will be more favorable to Rounds and Porter Lumber Company", giving specific instructions on how to handle future transactions, and concluding, "There are particular reasons why this decision has been reached and we ask that you do not question our judgment in authorizing such a plan".

An audit was made of the Flooring Company records by an independent accountant as of April 30, 1948, and rechecked as of June 30, 1948, from which it appears that current assets declined from $56,445.28 to $19,008.59. It also reveals that the lumber inventory decreased from $52,318.62 to $11,128.30 and the amount due for lumber increased from $40,396.02 to $55,147.11. The audit tends to show that the defendant stripped the Flooring Company of its liquid assets. For most discrepancies defendant, and Stanley in the testimony concerning certain necessary adjustments, has offered

an explanation. Without detailing this explanation, the substance of it is that the audit cannot be interpreted to show a "stripping of assets" by defendant. However, it is clear from exhibits attached that during this period, when defendant was in unquestioned control of the Flooring Company, it continued to take its products at prices below cost to the latter, inflicting an additional loss on every thousand feet sold, and without any regard for creditors whose claims had accrued prior to May 11, 1948, and subsequent to the date of incorporation of Taylor Oak Flooring Company.

Defendant, in its brief, challenges the right of the plaintiffs, other than the Trustee, to maintain this action, contending that the action should have been brought by the Trustee in the first instance.

Generally, the trustee alone has the power to sue on a claim belonging to the estate, but "the trustee, however, stands in the shoes of the bankrupt corporation in prosecuting a cause of action belonging to the bankrupt, and where the applicable state law makes such obligations or liabilities run to the corporate creditors personally, rather than to the corporation, such rights of action are not assets of the estate which are enforceable by the trustee". 4 Collier on Bankruptcy, 14 Ed., Sec. 70.29, p. 1182.

The point raised by this contention, presented now for the first time, is not free from doubt. Thus, the question raised is whether the claims of the creditor plaintiffs, which they assert as direct obligations of the defendant in the full amount thereof by virtue of the latter's control and manipulation of the Flooring Company, are such as might be asserted by the bankrupt's estate, or, by the bankrupt or a stockholder therein had bankruptcy proceedings not been instituted.

4 Collier on Bankruptcy, 14 Ed., Sec. 70.29, p. 1179, points out that: "The trustee in bankruptcy succeeds to any right of action the bankrupt corporation may have to recover damages for misconduct, mismanagement or neglect of duty by a corporate officer or director. As indicated in an earlier discussion, the bankruptcy of a corporation does not relieve its officers, directors or stockholders of any liability under the applicable law. Thus the trustee may prosecute a cause of action based on the fraud of the officers or directors, on an unlawful diversion of assets, or on a statutory liability created by the law of the state of incorporation. Similarly, the trustee may pursue any right of action accruing to the corporation against a stockholder for illegal diversion or use of corporate assets, or upon stockholder's liability under state law." At first blush, it would appear that the bankrupt corporation's cause of action, if any, would be limited to assets wrongfully converted or to the difference in the amount received on sales to the defendant, at the dictated price, and what should have been received at the market price. The claims of the plaintiffs are not so asserted and were not tried on that basis. On the other hand, it is quite clear under the state law that the creditors have a cause of action. Rounds & Porter Lumber Co. v. Burns, 216 Ark. 288, 225 S.W.2d 1.

However, as the court views the matter, the only real difficulty presented is the effect on this court's jurisdiction to adjudicate the claims of those creditors not themselves parties. As to plaintiffs, George H. Henderson, W. C. and Chrystelle Partee, and R. S. Foster, T. S. Grayson and J. B. Lee, the court has jurisdiction, either through their assertion of their claims or the trustee's assertion thereof for the benefit of the estate. In either event there is complete diversity of citizenship and the jurisdictional amount is present. As to the trustee Sec. 70, sub. e(3), National Bankruptcy Act, 11 U.S.C.A. § 110, sub. e(3) may be applicable. As to the remainder of the creditors, who are not parties, should it be that their claims are personal to them, the court, of course, would not have jurisdiction. Nevertheless, the court is not convinced that the trustee is not empowered to assert such claims for the benefit of the estate, and is of the opinion that it should proceed to adjudicate all claims, including those of creditors represented herein only by the trustee.

■ The court finds no merit in the contention of defendant that the pleadings fail to state a claim upon which relief can be granted. There was no misunderstanding on the part of anyone at the trial as to the issues, which were fully developed, or as to the relief sought by any or all of the plaintiffs. Suffice it to say that, regardless of the form of the pleadings, the plaintiffs have established a claim, and since defendant was not prejudiced, the pleadings, if in fact deficient, will be treated as amended to conform to the proof in accordance with Rule 15(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

■ In order to fix liability directly on defendant, the court must ignore the separate corporate entity of the Flooring Company. Normally, courts will and must respect such separate existence, but when, under the facts of a particular case, the administration of justice so requires, the fiction of corporate legal entity may be brushed aside and responsibility placed where it belongs. As stated in Nichols & Co. v. Secretary of Agriculture, 1 Cir., 131 F.2d 651, 655, quoting from Owl Fumigating Corporation v. California Cyanide Co., 3 Cir., 30 F.2d 812, 813: "When, as against the general rule that two separately incorporated companies are separate and distinct entities, it is charged that one is a mere agency or department of the other and is used as an instrumentality to perpetrate fraud, justify wrong, avoid litigation or render it more difficult, or generally to escape liability for what are in substance its own acts, courts will put aside the screen and, looking upon the situation through the group of negative rules, determine affirmatively the truth and place responsibility where it actually belongs." See, also: Darling Stores Corporation v. Young Realty Co., 8 Cir., 121 F.2d 112. The existence of this power cannot be challenged, but defendant asserts that the facts of this case do not warrant it being exercised. And, this is the real question presented in this case.

■ Numerous rules, most of them negative in form, have been developed. For instance, ownership of capital stock of one corporation by another does not alone create identity of interests or the relationship of principal and agent; identity of officers alone is not sufficient; and the loan of money by one corporation to another does not make the lender liable for the acts of the borrower. And, there are other negative rules. See: Nichols & Co. v. Secretary of Agriculture, supra; Annotation, 145 A.L.R. 475. It is impossible to formulate a general rule applicable to all cases, and the courts have not attempted to do so. Rather the over all picture as it appears from the facts dictates whether or not the power should be exercised.

Thus, in this case, if, aside from mere forms of law or legal fictions, the defendant dominated and manipulated the affairs of the Flooring Company for its own interest, rather than the best interest of the Flooring Company as a separate corporate entity, and used the latter as a mere agency or instrumentality for the advancement of its own interest, and in the process of so doing inflicted damage upon these plaintiffs, then the court should go directly to the real party in interest, and place responsibility on the defendant.

In Chicago, Milwaukee & St. Paul Railway Co. v. Minneapolis Civic & Commerce Association, 247 U.S. 490, 501, 38 S.Ct. 553, 557, 62 L.Ed. 1229, the court stated: "While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. United States v. Lehigh Valley R. R. Co., 220 U.S. 257, 273, 31 S.Ct. 387, 55 L.Ed. 458; United States v. Delaware, Lackawanna & Western R. R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438. In such a case the courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved as if

the corporate agency did not exist and as the justice of the case may require."

■ The court regards, as it must, this being a diversity case concerning rights and obligations incurred in Arkansas, a recent decision of the Supreme Court of Arkansas as being particularly persuasive, if not controlling. The case involved the same defendant, and liability was asserted and upheld upon the same theory relied upon here. The parties plaintiff in that case and here are different, and it appears that there may have been a somewhat more comprehensive development of proof in the instant case. But, an examination and comparison of the record in that case with the record in the instant case does not reveal any substantial difference in the material facts. In the course of its opinion, Rounds & Porter Lumber Co. v. Burns, supra, 216 Ark. at page 290, 225 S.W.2d at page 2, the court stated: "Now of course a parent corporation is not liable for the debts of its subsidiary merely because the parent holds the controlling interest or because the two are managed by the same officers. Lange v. Burke, 69 Ark. 85, 61 S.W. 165; Powell, Parent and Subsidiary Corporations, § 6 (a, b). It is only when the privilege of transacting business in corporate form has been illegally abused to the injury of a third person that the corporate entities should be disregarded. Powell, supra, § 3. One of the surest indications of such abuse, however, is the fact that the executives of the subsidiary, instead of acting independently in its interest, take their orders from the parent corporation in the latter's interest. Ibid., § 6(j). As we said in the Lange case, supra, the directors cannot lawfully manage the affairs of one of the corporations in the interest of the other." The court did not find it necessary to consider the extent of the control exercised by the defendant prior to May 11, 1948, although the claim of the plaintiff arose and was in existence at the time of the incorporation of the Flooring Company, but did say that the audit of April 30 showed that the Flooring Company had lost almost $29,000 in its operation and in addition thereto Manning Taylor owed the company about $21,500.

The court continued, p. 290, "even so the company was apparently still solvent, having begun business with assets valued at $60,000. Had the company been liquidated at once it appears that its creditors would have been paid but that the stockholders would have lost the greater part of their investment." And, the court further said, 216 Ark. at page 292, 225 S.W.2d at page 3:

"The chancellor was justified in concluding that during its two months of control the appellant stripped the Flooring Company of its liquid assets. In this process at least $55,000 worth of lumber and flooring ($41,000 of the original inventory plus $14,000 later bought on credit) had been sold—apparently at a loss, since the company's financial position declined to actual insolvency. Not only was the appellant the principal purchaser of this flooring; it was paying a price substantially less than that paid by third persons. Finally, the appellant emerged as the only secured creditor, with a mortgage on fixed assets valued at $81,000 on June 30. In the bankruptcy petition it proposed an arrangement by which the unsecured creditors would receive between fifteen and twenty per cent on their claims.

"We think the evidence supports the chancellor's conclusion that the appellant wrongfully manipulated the Flooring Company to its own advantage, at the expense of the appellee. Under the principles already stated, this conduct entitles the appellee to a judgment directly against the parent corporation, without regard to the separate entity of the subsidiary."

Regardless of whether the Flooring Company was solvent on May 11, 1948, it started as a solvent concern and in view of the extraordinary demand for finished lumber and the enormous price at which it was selling on the market, there appears no reason why it should not have continued to be solvent except for the action of the defendant in requiring the Flooring Company to sell the lumber to it at below cost. In other words this action was the primary cause of the continual operating loss of the Flooring Company from its incorporation. As heretofore stated the

contract of June 8, 1948, did not substantially alter the condition of the Flooring Company to the disadvantage of its then creditors, because the harm had been in progress since the date it began operations. The only purpose that Ralph M. Rounds, as President, and the defendant, Rounds and Porter Lumber Company, had in becoming interested in the creation of the Flooring Company as a corporation was to obtain a source of supply for defendant's far flung wholesale and retail lumber yards and they proceeded to operate the Flooring Company for that purpose until it was forced into bankruptcy by its creditors.

Any profit that defendant might have realized from the successful operation of the Flooring Company was merely incidental. From defendant's standpoint, the Flooring Company was neither set up nor operated as a separate entity seeking, as should be the case of any business, to make a profit for itself and its owners. While this might not be condemned from the standpoint of defendant's business welfare, it should be condemned from the standpoint of the rights of creditors dealing with the Flooring Company. As the Flooring Company was undercapitalized from the start, its only hope was to realize, from the beginning, a profit from its sales of flooring. The going market offered this opportunity, but the Flooring Company was never permitted to take advantage of it. Defendant insisted on this policy throughout the Flooring Company's existence, although it did not completely and without pretense take over until May 11, 1948. From that time it had an employee at Warren as General Manager, first Roy W. Elliott and later Calvin Johnson. It knew, at all times, that the Flooring Company was taking a loss on the flooring purchased by it.

Defendant points to the various loans made by it as evidence of its good faith interest in the welfare of the Flooring Company, but these loans are more consistent with its desire to keep the latter going until it had obtained as much flooring as possible. It never deviated from this policy, even though anyone with a good faith concern for the welfare of the Flooring Company would have recognized the real trouble, i. e. the failure of that company to realize a profit on its sales of flooring to defendant. W. O. Palmer's letter of June 16, 1948, to Roy W. Elliott and the former's communication to defendant's warehouses of the same date show wherein the real interest of defendant in its connection with the Flooring Company lay.

The court recognizes that defendant at no time actually held a controlling interest in the Flooring Company by virtue of stock ownership, it owning at all times 50%, and that, therefore, in a technical sense the relationship of parent and subsidiary corporations never existed between defendant and the Flooring Company. And, Manning Taylor, whose only connection with defendant was through the Flooring Company, was manager of the latter until May 11, 1948. Thereafter Roy W. Elliott and Calvin Johnson followed, in the order named, as General Manager, both, as stated above, employees of defendant. In view of these facts, defendant contends that May 11, 1948, is the earliest possible date at which it could be said defendant "controlled" the Flooring Company, and since all of plaintiffs' claims arose prior to that date, they have no standing to assert their claims against defendant. As will appear subsequently, the court finds no merit in this contention.

It is true that in most cases the corporation sought to be charged owned all or at least a majority of the stock of the other corporation. Thus, in that situation, the "parent" corporation had the right to control the "subsidiary" by virtue of stock ownership, and when it actually exercised that right and used the "subsidiary" as a mere instrumentality for its own advantage and the consequent disadvantage of the "subsidiary" as a separate entity, to the damage of third parties, the courts have dealt in actualities, brushed aside the separate legal existence of the "subsidiary", and placed responsibility on the "parent", where, in so far as the injured third parties were concerned, it actually belonged. But, in the opinion of the court, the real basis of liability is actual control and manipulation

of the other, whether that control and manipulation be exercised by virtue of stock ownership or otherwise.

In this case, the overall picture shows sufficient control and manipulation by defendant to charge it directly for obligations incurred to these plaintiffs. They furnished the raw products, from which defendant realized the real benefits, and as between the two, defendant is the one that must be made to suffer. The court does not believe that the point during the operations at which plaintiffs' debts arose is material. The principal vice during the entire period was defendant's policy of taking flooring at a loss to the Flooring Company. And, after it took over complete control, it made no real effort to salvage the Flooring Company by changing its policy, or for that matter, by stopping operations so that the creditors could realize something from the assets of the Flooring Company. It continued operations until forced to stop by involuntary bankruptcy proceedings.

■ Looking to the actualities in the matter, the court is convinced that the defendant controlled and manipulated the Flooring Company to such an extent that it should be charged with the obligations giving rise to plaintiffs' claims.

As previously pointed out, action on defendant's motion to quash was deferred until the trial on the merits. Service was had under the provisions of Sec. 27–340, Ark. Stats.1947, which provides, inter alia: "Any non-resident * * * corporation not qualified under the Constitution, and Laws of this State as to doing business herein, who shall do any business or perform any character of work or service in this State shall, by the doing of such business or the performing of such work, or services, be deemed to have appointed the Secretary of State * * * agent of such non-resident, upon whom process may be served in any action accrued or accruing from the doing of such business, or the performing of such work, or service, or as an incident thereto * * *."

■ Defendant's activities in this State were more than casual or occasional, and, in the opinion of the court the nature and extent of such activities were sufficient to bring the defendant within the statute as doing business or performing work or service. See: Fritchey v. Summar, D.C. W.D.Ark., 86 F.Supp. 391, a case concerning this statute in which this court discussed the Arkansas cases construing this statute. Furthermore, the court is convinced that these claims arose out of or accrued from the doing of such business, etc. The defendant's contention in this regard has been sufficiently answered previously in this opinion. Therefore, the service was valid, and defendant's motion to quash should be overruled.

■ As to damages defendant apparently contends that if it is liable at all, such liability must be limited to the difference between the price paid by it for the flooring purchased and the "gray market" price. The court does not agree. Defendant's purchases at below market prices throughout the period of the Flooring Company's operations is vitally important to a determination of whether defendant so controlled and manipulated the affairs of the Flooring Company as to make it directly responsible to creditors, but has no direct bearing on measure of damages. The court has concluded that defendant did so control and manipulate the affairs of that company, and the necessary result of that conclusion is that defendant is responsible for the obligations the same as if they had been incurred directly by defendant in the first instance. This being so, it is responsible for the full amount thereof.

■ One other contention should be discussed. As to plaintiff, George H. Henderson, the defendant contends that he actually received more money than the value of the lumber sold by him to the Flooring Company during the course of his transactions with the latter. This appears to be true, the major portion of that money being applied by Manning Taylor to pay for lumber sold to him prior to the incorporation of the Flooring Company. Henderson testified that after the incorporation of the Flooring Company and before he started shipping lumber to the latter he was advised that defendant was in the Flooring Company and that there would be plenty of

money available to pay him, and that he would be paid his old account. Upon this representation he shipped the lumber, and during the period he was paid substantial amounts on Manning Taylor's indebtedness. It appears that the practice of paying Henderson on his old account was called to the attention of the Directors, including, of course, those representing the defendant, and at least part of these payments were accepted and charged to Manning Taylor. Thus, the minutes of the Board of Directors meeting of May 11, 1948, show the charge of $1,768.83 to Manning Taylor, covering a payment of that amount to Henderson (Angelina Hardwood Sales Co.), which was included in Taylor's note of $9,296.19 given that day.

The lumber sold by Henderson, which would not have been forthcoming but for the arrangements made as to the payment of the old account, was received and used by the Flooring Company, and the defendant received the benefit therefrom in the form of finished lumber at a reduced price. This coupled with the acceptance by the Board of Directors of Taylor's practice of making payments on the old account is sufficient to charge the Flooring Company with the amount due for lumber furnished it by Henderson which has not been paid for, and, under the court's conclusions as to defendant's control and manipulation, sufficient to charge the defendant for that amount. In other words, the payments on the account of Manning Taylor or Manning Taylor Enterprises were made to induce Henderson to continue his shipments of rough lumber to the Flooring Company and were ratified by the defendant, and the defendant should not be allowed at this time to complain of the application of the major portion of those payments to the old account. The Findings of Fact show that some of the payments were applied to the current account of the Flooring Company, and in equity the parties should be left where they voluntarily placed themselves, which is to say that the amount still due Henderson on the Manning Taylor or Manning Taylor Enterprises account should not be charged to the defendant, but the amount still due for lumber shipped to the agent

and instrumentality of the defendant should be charged to the defendant.

In accordance with the above, plaintiffs are entitled to recover in the amounts set forth in the findings of fact and conclusions of law, and judgment to that effect will be entered.