DON G. PARKER, INC. *v.* POINT FERRY, INC. ET AL

5-5376                                   461 S. W. 2d 587

Opinion delivered January 11, 1971

*Murphy, Arnold & Blair,* for appellant.

*Hodges, Hodges & Hodges,* for appellees.

LYLE BROWN, Justice. Point Ferry, Inc., appellee herein, owned and operated a ferryboat which traversed the Black River between Independence and Jackson Counties, Arkansas. On March 27, 1967, the ferryboat foundered while transporting a truck and bulldozer owned by Don G. Parker, Inc., appellant. Point Ferry, Inc. filed suit in circuit court against Parker, Inc. and others to recover for damage to the ferryboat. Parker, Inc. counterclaimed for damage to its property caused by the sinking of the ferryboat and later cross complained against Andy Doyle, Dorse White, and William V. "Bud" Deaton, alleging that they were members of a partnership or joint venture which owned and operated the ferry ostensibly as Point Ferry, Inc., and that the corporate body was the alter ego of the Doyle-White-Deaton partnership. Appellant contended that the recognition of Point Ferry, Inc. as a separate entity would work an injustice upon appellant, that the corporate form should be disregarded, and that Doyle, White, and Deaton should be held liable for damage sustained by appellant.

When the contention of personal liability of the incorporators of Point Ferry emerged, the circuit court transferred the issue to chancery for determination, while retaining jurisdiction of the other issues. (The propriety of the transfer to chancery is not challenged on appeal.) The chancellor concluded that the appellant had failed to prove by a preponderance of the evidence that the corporate entity should be disregarded in order to hold the shareholders personally responsible. From that determination this appeal was taken.

Appellant contends (1) that the three stockholders did not treat the corporation as a separate entity in fact; (2) that to allow the shareholders immunity from corporate debts would work an inequity on appellant; and (3) that the ferry was operated in disregard of statutes requiring licensing and bonding of ferries.

For some eighteen years Ernest C. Dyke owned and operated the Point Ferry. In August 1963 Dyke sold the ferry and all equipment to Bud Deaton, Andy Doyle, and H. T. Hankins. The three purchasers immediately took all necessary legal steps to establish a corporation, Point Ferry, Inc., and transferred the ferrying equipment to the corporation. One hundred shares of stock were issued to each incorporator. Each of them had contributed $1,000 toward the down payment to Dyke and they took shares of stock from the corporation in consideration of those payments. (Hankins shortly sold his interest to Dorse White.) At the time of the purchase the ferry was not in operation. That fact compelled the incorporators, who owned land on both sides of the river, to go several additional miles to cross the ferry at Oil Trough. That was one of the reasons they decided to purchase and reactivate the ferry. They testified that they also expected to make a profit from the operation.

Point Ferry, Inc. leased the ferry to Morris Dunivan, who testified that he was licensed by the United States Coast Guard as an operator. The equipment was so leased on the day it sank, but the father of Morris Dunivan was operating it, apparently on a temporary basis and at the instigation of the son. The father was not a licensed operator.

Point Ferry never opened a bank account. The monthly lease rent was seldom, if ever, sufficient to make the deferred monthly payments owed Mr. Dyke on the purchase price and to pay the operating costs. Jerry Hinkle was a bookkeeper for a cooperative farm supply company, of which Andy Doyle was president. Hinkle attended to the financial affairs of the corporation. The lessee of the ferry would monthly deliver the net receipts to Hinkle and the latter would call on the individual shareholders for whatever amount was needed to meet the payment then due Dyke. Hinkle kept a record of the described transactions in "a little book," but that book was not a part of the corporation records. Apparently Hinkle's records were utilized by the attor-

ney who annually filed the tax returns for the corporation.

If the shareholders or the board of directors of Point Ferry, Inc. ever held a formal meeting after the organizational meeting, it is not shown in the official corporation record book. However, the incorporators insisted that they frequently met at their attorney's office where their records were kept. They also introduced proof to show that tax returns, reports to the Arkansas Assessment Coordination Department, and reports to the United States Coast Guard, were filed in the name of the corporation.

Appellant suggests (1) that the corporation was under-capitalized; (2) that appellees operated the ferry without complying with the license and bonding statutes; (3) that no public liability coverage was in force; and (4) that no notice of the corporate nature of the boat's ownership was displayed on the premises, which notice would advise the users that they were dealing with an organization of limited liability. Appellant argues that when those factors are considered, along with the allegation that the incorporators treated their association as a partnership, it would be inequitable to permit appellees to obtain refuge behind the corporate facade.

The only activity, or nonactivity, pointed up by appellant and which could be classed as *illegal,* would be the operation of the ferry without complying with Ark. Stat. Ann. §§ 76-1704 and 76-1715 (Repl. 1957). The first section requires that a license be obtained from the county court to operate a ferry. The latter section requires the posting of a bond as a prerequisite to operating a ferry. But the answer to that argument is that appellee corporation did not operate the ferry; Morris Dunivan took over the operation under a written lease and the undisputed testimony was to the effect that the stockholders of Point Ferry were in no manner connected with the activity. It is true that on the day the ferry sank it was being operated by Dunivan's

father, the son having selected the father to substitute for him; it is not contended that the stockholders had anything to do with this temporary arrangement between father and son.

Our case of *Rounds & Porter Lbr. Co.* v. *Burns,* 216 Ark. 288, 225 S. W. 2d 1 (1949), sets out the rule we follow for disregarding the corporate veil. "It is only when the privilege of transacting business in corporate form has been illegally abused to the injury of a third person that the corporate entities should be disregarded." To the same effect see *Banks* v. *Jones,* 239 Ark. 396, 390 S. W. 2d 108 (1965); and *Black & White, Inc.* v. *Love,* 236 Ark. 529, 367 S. W. 2d 427 (1963). In *Banks* we said, "[T]he rule of piercing the fiction of a corporate entity should be applied with great caution." We have carefully considered the citations by appellant of respected text authorities who sanction a much broader base for disregarding corporate entities, but we decline to deviate from our own rule which is well established.

The trial court found as a matter of fact that there had been no illegal abuse of the corporate structure to the detriment of appellant, and we are unable to say that his findings are against a preponderance of the evidence.

Affirmed.