**In re OZARK RESTAURANT EQUIPMENT CO., INC.**

**James G. MIXON, Trustee, Plaintiff,**

**v.**

**Bruce ANDERSON, Elmer Dale Yancey, Kenneth Eads, Robert Whiteley and Anderson Cajun's Wharf, Defendants.**

**James G. MIXON, Trustee, Plaintiff,**

**v.**

**ANDERSON CAJUN'S WHARF, Defendant.**

**James G. MIXON, Trustee, Plaintiff,**

**v.**

**Hayden McILROY of McIlroy Bank & Trust, Ed Yancey, Bruce Anderson and Kenneth Eads, Defendants.**

Civ. No. 84–5097.
Bankruptcy No. FA 82–120.
Adv. Nos. 82–882 to 82–844.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

May 22, 1986.

Jill Jacoway, Successor Trustee, Fayetteville, Ark., for plaintiff, James G. Mixon, Trustee.

Raymond C. Smith, Fayetteville, Ark., for defendants, Bruce Anderson, Robert Whiteley, Elmer Dale Yancey, a/k/a Ed Yancey, and Anderson Cajun's Wharf.

William R. Gibson, Fayetteville, Ark., for defendant, Hayden McIlroy of McIlroy Bank & Trust.

Marshall Dale Evans, Fayetteville, Ark., for defendant, Kenneth Eads.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### A. Background

This is an appeal from a decision of the United States Bankruptcy Court for the Western District of Arkansas in three adversary proceedings consolidated for trial in actions arising out of the bankruptcy of Ozark Restaurant Equipment Co., Inc. Jurisdiction initially rested in bankruptcy court pursuant to 28 U.S.C. §§ 1471 and 1481, 11 U.S.C. § 105, and General Order No. 24 of the United States District Courts for the Eastern and Western Districts of Arkansas. 41 B.R. 476. From a decision in favor of the Trustee in all three proceedings, Bruce Anderson and Anderson Cajun's Wharf, a Little Rock restaurant, and Elmer Dale Yancey and Robert Whiteley bring this appeal pursuant to 28 U.S.C. § 158. This court recognizes the "clearly erroneous" standard of review for factual determinations made by the bankruptcy judge. Bankr.R. 813. *See also In re Reid,* 757 F.2d 230 (10th Cir.1985) (Bankruptcy Amendments of 1984 do not affect standard of review in bankruptcy matters).

In September, 1980, Bruce Anderson and Elmer Dale Yancey purchased a going concern, Ozark Restaurant Equipment Company of Springdale, Arkansas. Each had a 50% interest. The two named Kenneth Eads manager of the company, secured a $100,000.00 loan from McIlroy Bank, loaned an additional $9,000.00 from their own funds, and capitalized the business at $1,000.00. Parties expert at appraising the capital needs of a business the size of Ozark, and of restaurant equipment businesses specifically, testified that Ozark was grossly undercapitalized from the beginning.

The business never made a profit. Part of the problem appeared to be that Ozark failed to collect a sufficiently high sales mark-up on deliveries made to Anderson Cajun's Wharf, a restaurant partly owned by Bruce Anderson (51%) and Kenneth Eads (5%) during the relevant time period. Parties expert at the restaurant equipment business estimated that one needs to average a 30% mark-up on a combined line of hard and soft goods to make a profit. In sales to Anderson-related enterprises, specifically Cajun's Wharf, Ozark collected only 7% over cost, and even that small profit was rendered negligible by sales tax (4%) and by the fact that Cajun's paid

Ozark invoices late by an average of 77 days at no interest. Items like commissions and freight would further erode gross profit, although some testimony suggested that salesmen received no commission on sales to Anderson, and that Anderson himself paid the freight.

Accountants traced certain transactions to show that certain sales were made to Anderson enterprises below cost. By way of contrast, evidence was introduced (and not refuted) that sales were made to non-Anderson enterprises at mark-ups between 28% and 90%. The picture emerged through the hearing that Ozark was a captive of Anderson and his enterprises, and that the reason for its existence appeared to be to give Anderson enterprises access to equipment at dealer cost or "just above" because manufacturers like Libby and Hobart would not sell direct to Anderson since they had their own dealers in the Little Rock area.

Bruce Anderson vigorously disputed this characterization of his motives. He testified that a 10% mark-up was normal for a volume buyer like himself, and averred that he bought from Citco, the nation's largest supplier, on those terms, as well as from Don's Bar Supply in Little Rock. Significantly, however, Anderson did not call any witnesses to support his testimony, or offer any documentary proof of his assertions.

Most disturbingly, the Trustee introduced documentary evidence in the form of fraudulent balance sheets, prepared August 31, 1981, which were evidently used to lull suppliers into sending merchandise to Ozark on credit. These documents admittedly misstated Ozark's position. Ozark workers testified that the balance sheets were prepared simply "in-house." In the words of Whiteley, "It was not the intent to give that to anyone because it was not an official ... we were trying to establish the reflection of the company without having proper expertise in putting together that balance sheet." The Trustee testified that he found numerous copies of this balance sheet in the office, and that one copy was stapled to a telegram from a supplier demanding a recent balance sheet as a condition of selling Ozark equipment on credit.

There can be no doubt but that Bruce Anderson was fully aware of Ozark's failing fortunes at least as early as December 31, 1980, and was aware after that that the company was insolvent and was making no progress towards solvency. It appears from the testimony of accountants that the enterprise never made a monthly profit afterwards. Instead, its net worth steadily declined from minus $1,400.00 in December, 1980, to minus $146,000.00 in September, 1982, a bare twenty months later. Sometime in March, 1981, as Ozark's decline began picking up speed, Bruce Anderson directed that Ozark's mark-up to his enterprises fall from 15% to 10%. Anderson enterprises were responsible for approximately 23% of all sales made by Ozark during its association with Anderson.

There were numerous instances of self-dealing between Anderson enterprises and the debtor. For example, in July, 1982, when Anderson closed the debtor and filed bankruptcy, Anderson selected certain items from the debtor's inventory to be shipped to another equipment business owned by him. The total value of this merchandise was $20,208.39. No payment was ever made for this. Instead, Anderson tried to prove that it was a swap-out for merchandise earlier consigned by him to the debtor. The bankruptcy court found his proof on this point to be lacking; reviewing the record, it appears nigh non-existent.

### B. Trustee's Standing

This appeal poses the difficult question whether a Chapter VII trustee has standing to assert the claim that the debtor corporation was an *alter ego* of third parties. Although neither side raised the question specifically, we are obliged to examine the trustee's standing, as a matter of the case-or-controversy requirement associated with Article III. *Juidice v. Vail*, 430 U.S. 327, 331–32, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977).

In *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), the court held that a reorganization trustee lacked standing to assert creditors' causes of action against third parties. This court initially reads *Caplin* restrictively, as relevant only to reorganization proceedings brought under pre-Code bankruptcy law. Such a reading is warranted by *Caplin's* suggestion that the standing issue was "capable of resolution by explicit congressional action." *Id.* at 422, 92 S.Ct. at 1682. Six years later, Congress overhauled the bankruptcy laws.

In addition, the *Caplin* opinion is flavored with a suggestion that a reorganization trustee's powers did not extend as far as those of a liquidation trustee. This circumstance, too, impels the court to apply *Caplin* cautiously. Judicial economy is ill-served when an appellate court, *sua sponte*, dismisses a fully-litigated case on a standing issue.

 Congress does not appear to have explicitly empowered the trustee to bring an *alter ego* action on behalf of creditors. His is not a roving commission. His position does not empower him to bring suits personal to a creditor. *Melamed v. Lake County National Bank*, 727 F.2d 1399 (7th Cir.1984). An *alter ego* action is personal to creditors, and may not in fact be filed by a corporation. *See* 18 Am.Jur.2d *Corporations* § 46. This rule finds inferential support in Arkansas, where in *Shipp v. Bell*, 256 Ark. 89, 505 S.W.2d 509 (1974), a party was estopped to *deny* its own corporate status.

Congress has specifically enumerated the trustee's powers and duties, the principal one being to collect and liquidate the property of the estate. 11 U.S.C. § 704. Property of the estate is defined as all legal and equitable interests the debtor has in property. 11 U.S.C. § 541. That formula includes choses in action. 4 Collier's On Bankruptcy § 541[01] (15th ed. 1979).

In addition, Congress has given the trustee rights of action which the debtor could not have maintained under common law, *i.e.*, to void fraudulent conveyances and preferences. 11 U.S.C. §§ 547, 548. A debtor has no right at common law to rescind a fraudulent conveyance. *McCune v. Brown*, 8 Ark.App. 51, 648 S.W.2d 811 (1983). Congress empowers the trustee to do so. Similarly, at common law neither the debtor nor an unfavored creditor could sue to void a preference. *Baker v. Gowers*, 180 Ark. 1110, 25 S.W.2d 438 (1930). Under the Code, a trustee can. Congress has not otherwise provided that the trustee might bring a creditor's action against third parties, even under an *alter ego* theory. Particularly after *Caplin*, this is disturbing.

We take this circumstance not to mean that the new Code prohibits the trustee from suing, but merely that Congress has left us where it found us, and that we must make our way by our own lights. *Caplin* enjoins us in such a case to "... resolve [the question of a trustee's standing] by examining the nature of [the bankruptcy proceeding], the role of the trustee in [the proceeding] and the way in which standing to sue on behalf of [creditors] would affect or change that role." 406 U.S. at 422, 92 S.Ct. at 1682.

In deciding *Caplin*, the court noted that in "contradistinction" to a bankruptcy proceeding where liquidation of a corporation and distribution of its assets is the goal, a Chapter X proceeding is for purposes of rehabilitation and reorganization. In all candor, for present purposes, this appears to be a contradistinction without a difference. If a trustee is appointed to rehabilitate a corporation, it would be obviously beneficial to the corporation to require parties actually causing or contributing to injuries to creditors to pay up and thereby lighten the load of debt to be serviced by the reorganized entity. If this vital interest does not suffice to give a reorganization trustee standing to sue for wrongs done to creditors, then the court is at a loss to understand why a trustee of a defunct entity has a more forcible argument for the exercise of such powers. At least in the former instance, an interest of the entity is being addressed. In a Chapter VII case,

*only* creditor interests are being asserted. The court does not intend by this observation to disparage those interests, only to say that since such is the case, the creditors and the creditors alone should pursue them. One of the major functions of the standing requirement is to assure vigor and adversity in the prosecution of a claim. "Third parties themselves usually will be the best proponent of their own rights." *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976).

It bears remarking in this context that a corporation in a Chapter VII proceeding is not eligible for a discharge, as an individual is. 11 U.S.C. § 727(a)(1). Practically speaking, the corporation emerges from a Chapter VII proceeding with no future existence, and no interest at all in retiring obligations which remain undischarged after the liquidation of its assets. If it should ever resume business, its capital would be immediately subject to the claims of creditors. Congress has so explicitly provided in order that trafficking in bankrupt corporations and partnerships be deterred. 4 Collier On Bankruptcy § 727.-01[2]. Whereas a reorganized corporation has an interest in retiring obligations, a Chapter VII corporation does not. This circumstance even more clearly identifies the interest of an *alter ego* proceeding as one unique to creditors, not one common to the entity and its creditors.

 A cumulation of detail on the nature of a Chapter VII corporate bankruptcy proceeding, as this one is, impels one to the conclusion that the *Caplin* standing rule must apply *a fortiori* to our case. If necessary, a further reason suggests itself why this must be so. In the plenitude of cases brought by corporations under Chapter VII, a number of debtors may actually have some assets available to apply to the claims of unsecured creditors, or the trustee may be successful in avoiding liens, recovering preferences, or attacking transfers in fraud of creditors, and thereby augmenting the estate for the benefit of the unsecured creditors. If the trustee determines that suit might lie on an *alter ego*

theory, he must perforce use assets of the corporation to prove his point. Of course, this is true regardless of the nature of the proceeding he undertakes. The critical difference is this: *alter ego* proceedings are not favored in the law. One must generally show that the entity was used in fraud of third parties. *Cf. Green v. Equitable Powder Mfg. Co.,* 95 F.Supp. 127, 131 (W.D.Ark.1951). In Arkansas, fraud must be proved clearly and convincingly, and is never presumed. *Rice v. Rice,* 125 F.Supp. 900 (W.D.Ark.1955). An *alter ego* finding, accordingly, is one which is to be made with great caution. *Plant v. Cameron Feed Mills, Inc.,* 228 Ark. 607, 309 S.W.2d 312 (1958). A Chapter VII trustee suing on an *alter ego* theory puts creditors' funds at risk in a speculative venture, or one which requires a higher-than-ordinary standard of proof, to obtain a remedy which must be sparingly ordered. The court strongly feels that the creditors themselves are in the best position to determine whether the gamble should be taken, and in by far the best position to fund one.

The role of the trustee in liquidation, the second prong of *Caplin's* three-part test, *supra,* is defined by 11 U.S.C. § 704. It includes the duty to collect and reduce to money the property *of the estate* for which such trustee serves. 11 U.S.C. § 704(1). Property of the estate is defined to include the debtor's "legal or equitable interests ... in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). We have previously discussed that the debtor has no right to file an *alter ego* action. Such rights have historically belonged to creditors alone, to be enforced by a creditors' bill in equity. 3 R. Clark, *The Law and Practice of Receivers* §§ 795, 796(a), 802 (3rd ed. 1959).

Admittedly, *Henderson v. Rounds & Porter Lumber Co.,* 99 F.Supp. 376 (W.D. Ark.1951), offers some support for the Trustee's position in this case. There, the trustee *joined* an *alter ego* proceeding brought by a creditor. The creditor has standing to bring such an action; there was never a pure Article III question in-

volved in *Henderson.* A close reading of that opinion instantly reveals that, if anything, the decision actually attacks the proposition that the trustee, acting alone, has any power to bring an *alter ego* action. First, the defendant argued that *the creditor* had no right to bring the suit, and that *only* the trustee was so empowered. To this the court responded that the trustee has no power to enforce rights running solely to creditors. *Id.* at 380.

Second, the court noted that the trustee succeeds to any right the corporation has against its directors or shareholders for misconduct. Clearly, however, this right extends only to the limits of the misconduct. It does not extend to all debts of the corporation, some of which may arise because of bad business climate or managerial decisions immunized under the "business judgment rule."

An *alter ego* action, however, charges the defendants with *all* the losses of the business, not just those occasioned by their fraud. A creditor in such a case essentially declares, "I transacted with Ozark, but in reality with Anderson because Ozark was nothing more than Anderson." If that be the case, there is no need to show that the creditor was defrauded by a specifically deceitful misrepresentation. The equity court investigates the affairs of the debtor and the third party to determine whether the third party has properly honored the debtor's status as a distinct entity. If he has, giving him the benefit of the doubt, then the equity court will deny the creditor's bill, recognizing that a very valid aim of incorporation is the limitation of personal liability to the capital invested in the enterprise. If, however, he has abused the corporate form, then the question whether the creditor is specifically aggrieved by an act of the shareholder is irrelevant. The shareholder is liable because of an abuse of the form, sometimes for trifles such as for failing to pay a franchise tax to the state.

*See, e.g., Moore v. Rommel,* 233 Ark. 989, 350 S.W.2d 190 (1961).

Third, *Henderson* acknowledged that the trustee would ordinarily be limited to the amounts wrongfully appropriated. The court acknowledged that the *claims of the plaintiffs* were not tried on that basis, noting specifically that under state law creditors did have the right to seek the relief pursued in the case. *Id., citing Rounds & Porter Lumber Co. v. Burns,* 216 Ark. 288, 225 S.W.2d 1 (1949).

Finally, having at least one party properly able to present an *alter ego* claim before it, *Henderson* proceeded to allow the trustee to assert those belonging to the estate; and as an additional matter, the court permitted the trustee to assert the claims of absent creditors "for the benefit of the estate." As Blumberg, *The Law of Corporate Groups: Bankruptcy Law,* (Little Brown 1985) § 15.18, freely acknowledges, "The [*Henderson* ] court did not trouble to cite any authority for its unusual action."

What alternative, however, did the *Henderson* court, sitting as a chancellor,[1] have? To have forbidden the trustee to act would have allowed the individual creditors to take a judgment for 100% of their claims. Other creditors, subsequently suing, stood the chance of acquiring only a fraction of their own. The judgment against Rounds & Porter Lumber, then, would be in the nature of a preference itself!

It is important to note that the federal judge in *Rounds & Porter* sat as a chancellor in diversity. At that time, Arkansas maintained separate courts of law and equity, whose procedures were not merged. *See* Note, 24 Ark.L.Rev. 162, 176 n. 54. Under the doctrine of virtual representation, an equity court would order class-wide relief in a decree, even though only a single party brought the action. It was not necessary for the party to be named as a class

1. The action was commenced in state chancery court, and removed to federal court because of diversity.

member, or to sue or be sued as a member of a class, so long as it appeared that he was in fact a member of a class, and sued or defended the action along class principles. *See, e.g., Ussery v. Darrow,* 238 Ala. 67, 188 So. 885, 890, 891 (1939). In *District No. 21 United Mine Workers of America v. Bourland,* 169 Ark. 796, 806, 277 S.W. 546 (1925), the court said, "A creditors bill has always been one of the favorite subjects of equity jurisprudence, and in a case where the setting aside of a fraudulent conveyance is the primary object of the bill, equity, having required jurisdiction of the case for that purpose, will settle all the issues involved and afford complete relief."

Judge Miller, in *Henderson v. Rounds & Porter Lumber Co., supra,* sat as a chancellor in diversity and fashioned a decree to settle all issues and obtain complete relief. He could have appointed a creditor as representative of the class and probably "should have." That creditor would have then been impressed with a trust with respect to the fund, and would have therefore had all the worst of the bargain since he never sued in a representative capacity, and probably had no interest at all in any matter other than to get his own judgment and conclude his involvement in the action.

Being of an eminently and admirably practical turn of mind, Judge Miller selected the one party before him who already was impressed with a trust, namely the bankruptcy trustee, and designated him as representative of other creditors under former section 70(e), an analog to present section 544(b) of the Code. The hand of equity is quicker than the eye of law. Section 70(c) followed the rule of *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed.133 (1931), and gave the trustee the power to avoid any transfer of an interest of the debtor voidable under state law by a creditor. An *alter ego* proceeding does not invalidate the transfer of an interest—it imputes the obligations of one party to another regardless of any "transfer." The creditor who dealt with "the shell" has a personal right which is not shared in any sense by the trustee of "the shell," and creditors alone may vindicate that right.

Where *Caplin* has called directly into question a trustee's standing, and that standing was not broadened by Congress despite the Supreme Court's direct invitation to them to act, this court deems it necessary to re-examine *Henderson v. Rounds & Porter Lumber Co., supra.* The *Henderson* court handled the case much as an Arkansas chancellor would, saying that he would proceed to adjudicate all claims because he was "not convinced that the trustee was not empowered to represent their interests." 99 F.Supp. at 380. Of course, the question is ordinarily put the other way around, and in the federal system the plaintiff is ordinarily obliged to prove his standing, to a point where a court is satisfied that he can bring his suit.

*Henderson* is *sui generis.* It took what has been described as unusual action, but one which was probably not unusual for Arkansas practice in those days, before the procedures of law and equity were officially unitized. Now that the state courts have unitized their procedures, Arkansas Rules of Civil Procedure, Rules (ARCP) 1, 2 and 81, and have propounded a class action rule that comports more fully with federal notions of due process *via* a notice requirement, ARCP Rule 23(d), a chancellor does not have the liberty formerly enjoyed by him to shape relief for absent parties who were "virtually represented" in the equity proceeding. That is, it is doubtful that Judge Miller today would shape relief as he did thirty-five years ago, because Arkansas chancellors now would not do so. It is especially improbable that he would have done so in an original action, ancillary to a bankruptcy proceeding whose organic law does not give its trustees broad standing powers.

In short, nothing in *Henderson* suggests that the trustee has standing to bring an *alter ego* proceeding by himself. Nothing in the new Code defines the trustee's duties

to embrace the collection of property the estate never owned. When the trustee sues, he sues in the name of the estate. The *alter ego* action by a trustee fails an ontological test, since he essentially asks a declaration that the entity does not exist, despite the fact that he has previously administered assets as if the entity owned them.

Finally, the third part of the *Caplin* inquiry asks whether there is any way in which giving the trustee standing to sue on behalf of creditors would change or affect his role as a liquidator. In a Chapter VII proceeding, giving him such standing creates a situation rife with conflicts, conflicts which can only be resolved if the creditors alone are recognized as proper parties plaintiff in an *alter ego* proceeding.

One of the duties of a Chapter VII trustee is to "examine proofs of claims and object to the allowance of any claim that is improper." 11 U.S.C. § 704(4). One of his duties, then, is to whittle the number of unsecured claims against the estate. If, however, a third party exists who is "good" for the claims, the trustee has no motive to pursue his duties under § 704(4). In fact, given that his compensation depends on the size of the estate, he actually has an interest in allowing as many claims as possible so that the recovery, and his compensation, is as large as possible.

To the extent that his interest becomes personally adverse to the third party, by allowing marginal claims which might be disallowed at his instance, it becomes adverse to "true creditors" whose interest in the third party's funds may be diluted below a dollar-for-dollar recovery if the trustee's conflicting interests influence him to forbear challenging marginal claims against the estate. These creditors, in a suit where the trustee acts alone, are unrepresented. They must depend on one having an adverse interest—the third party—to make the kinds of objections the law requires the trustee to make. [It should be noted in this connection that the estate in a Chapter VII case is deemed to have *no* standing to object to the allowance of a claim unless to do so would result in a surplus distributable to the debtor. *Kapp v. Naturelle, Inc.,* 611 F.2d 703, 707 (8th Cir.1979).]

### C. Conclusion

 We accordingly decide then that a Chapter VII trustee liquidating a corporation has no standing on his own to bring an *alter ego* action. He does have power, of course, to avoid preferences and fraudulent transfers. It appears that the trustee correctly found that the $20,208.39 worth of merchandise shipped to Anderson's enterprises was a transfer in fraud of creditors, and the bankruptcy court's judgment will be affirmed in that particular. The bankruptcy court did not find that the "low mark-ups" accorded Anderson and his enterprises were fraudulent transfers as they are defined in the Code, or preferences. This issue will be remanded to the bankruptcy court for further findings. It is unclear to the court whether these transfers were "on account of an antecedent debt" as required by § 547(b)(2). It is also unclear whether property transferred to a third party is fraudulent within the scope of § 548(a)(2)(A) where the property was sold at 80% of retail value, and above cost. The bankruptcy court, in giving the Trustee judgment for the entire amount of the unsecured debt, has not particularized its findings. The case is therefore remanded for further proceedings consistent with this opinion.