In the Matter of OZARK RESTAURANT EQUIPMENT COMPANY, INC., Debtor.

Jill R. JACOWAY, trustee in bankruptcy, Plaintiff,

v.

Bruce ANDERSON, Elmer Dale Yancey, Kenneth Eads, Robert Whiteley, and Anderson Cajun's Wharf, Defendants.

Jill R. JACOWAY, trustee in bankruptcy, Plaintiff,

v.

ANDERSON CAJUN'S WHARF, Defendant.

Jill R. JACOWAY, trustee in bankruptcy, Plaintiff,

v.

Hayden McILROY of McIlroy Bank and Trust, Ed Yancey, Bruce Anderson and Kenneth Eads, Defendants.

Bankruptcy Nos. FA 82–120, AP 82–882 to AP 82–884.

United States Bankruptcy Court, W.D. Arkansas, Fayetteville Division.

Jan. 15, 1987.

See also 816 F.2d 1222.

Lewis F. Steenken, Westphal & Steenken, Fayetteville, Ark., for trustee.

Raymond C. Smith, Fayetteville, Ark., for Bruce Anderson, Elmer D. Yancey, Robert Whiteley and Anderson Cajun's Wharf.

Marshall Dale Evans, Fayetteville, Ark., for Kenneth Eads.

William R. Gibson, Fayetteville, Ark., for Haden McIlroy of McIlroy Bank & Trust.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING JUDGMENT OF JANUARY 15 1987

DENNIS J. STEWART, Chief Judge.

A predecessor trustee in bankruptcy filed these three adversary actions seeking to recover, under various theories of recovery, equivalents in value of certain transfers of value of merchandise to the several defendants, who were alleged to be insiders of the debtor. The actions were consolidated for trial and a hearing of the merits of the consolidated actions was conducted by the Honorable Charles W. Baker on October 14, 1983, and November 18, 1983. On May 18, 1984, Judge Baker filed his findings of fact, conclusions of law and final judgment. The relevant findings of fact made by Judge Baker are incorporated into this memorandum by reference. In his findings, Judge Baker found that the defendants Anderson, Yancey, Eads, and Anderson Cajun's Wharf were insiders to the debtor [1]; that "[t]he debtor never made a true profit and continually throughout its existence showed a negative net worth"; that, "[a]lthough normal profit margins or 'markups' would, necessarily, in a profitable business comparable to debtor's, be 25% to 30%, the debtor sold in volume to Anderson-related entities at 10% to 15% markups" [2]; that, "in July, 1982 Bruce Anderson selected certain items from the debtor's inventory to be shipped to Port City Equipment of a value of $20,208.39 [and] was never paid for this transfer"; that "[i]n July, 1982 Bruce Anderson closed the debtor and decided to file for relief under the United States Bankruptcy Code"; that the debtor continuously had a negative net worth from December 31, 1980, to September 1, 1982 [3]; and that, between September 9, 1981, and May 11, 1982, $24,035.82 in payments were made to McIlroy Bank.

On the basis of those findings of fact, Judge Baker concluded and entered judgment as follows:

(1) On the basis that the transfers were preferential within the meaning of § 547 of the Bankruptcy Code, the $24,035.82 was held recoverable from McIlroy Bank (who, in turn, was held entitled to recover the same sum on the basis of a guarantee from Anderson and Yancey.)

(2) In AP 82–882, Judge Baker concluded that "the defendants abused the corporate entity of Ozark Restaurant Equipment Co., Inc., to such an extent that they should be held liable for the debts of the debtor herein ... jointly and severally in the sum of $126,908.18."

(3) In AP 82–883, Judge Baker entered judgment against Anderson Cajun's Wharf, the apparent alter ego of Port

---

1. Judge Baker found Anderson to be a 50% owner and director of debtor as was Yancey; that Port City Equipment Co. was a subsidiary of Anderson Cajun's Wharf, Inc., of which Anderson is chief executive officer; that Eads was a director and president of the debtor; that Anderson was also executive officer of Gonzales and Gertrude's; and that Whiteley was a controlling employee of Port City Equipment Co. These findings make the defendants "insiders" of the debtors within the meaning of § 101(30) of the Bankruptcy Code.

2. Judge Waters superseded this finding with a finding that the Anderson-related entities were sold to at only 7% markup.

3. Judge Baker found the debtor to have the following magnitudes of negative net worth on the following dates:

| | |
|---|---|
| 12–31–80 | $ (1,400) |
| 04–30–81 | (14,043) |
| 04–30–81 | (80,000) |
| 09–01–82 | (146,000) |

City Equipment Co.[4], for the $20,208.39 shipped to the latter entity in July 1982 on the basis that it constituted a preferential transfer within the meaning of § 547 of the Bankruptcy Court.

*Appeal to the District Court*

Judge Baker's decision was appealed to the district court. On May 22, 1986, 61 B.R. 750, the Honorable H. Franklin Waters issued an order remanding these actions to the bankruptcy court. The legal conclusion reached by Judge Waters in his opinion of May 22, 1986, was that:

"a chapter VII trustee liquidating a corporation has no standing on his own to bring an *alter ego* action. He does have power, of course, to avoid preferences and fraudulent transfers."

The apparent effect of this ruling was to vacate the judgment in AP 82–882, which is described in paragraph (2), *supra*. Otherwise, the other two judgments appear to have been affirmed, that in AP 82–883 expressly[5] and that in AP 82–884 (described in paragraph (1), *supra*) by implication.[6] The duty which was assigned to this court on remand was to determine whether "the 'low mark-ups' accorded Anderson and his enterprises were fraudulent transfers as they are defined in the Code, or preferences."

*Consideration in this court
after remand*

After assignment of this case to the undersigned, a hearing on the issues defined by the order of remand was held on No-

vember 25, 1986, in Fayetteville, Arkansas. This was done despite the existence of the trustee's pending appeal of Judge Waters' order of May 22, 1986, to the United States Court of Appeals for the Eighth Circuit.[7] For, ordinarily, an order of remand is non-appealable[8] and, in this action, it did not appear that the standing issue which would be determined on appeal would affect the issue of whether additional value could be recovered on the theory of preference or fraudulent transfer.[9]

The trustee, in the hearing of November 25, 1986, primarily relied upon the evidence previously presented in the hearings conducted by Judge Baker, primarily on the testimony which formed the basis for Judge Waters' observations and findings[10] as follows in his order of May 22, 1986:

"The business never made a profit. Part of the problem appeared to be that Ozark failed to collect sufficiently high sales mark-up on deliveries made to Anderson Cajun's Wharf, a restaurant partly owned by Bruce Anderson (51%) and Kenneth Eads (5%) during the relevant time period. Parties expert at the restaurant equipment business estimated that one needs to average a 30% mark-up on a combined line of hard and soft goods to make a profit. In sales to Anderson-related enterprises, specifically Cajun's Wharf, Ozark collected only 7% over cost, and even that small profit was rendered negligible by sales tax (4%) and by the fact that Cajun's paid invoices late by an average of 77 days at no interest ... By way of contrast, evidence was

4. See note 1, *supra.*

5. "It appears that the trustee correctly found that the $20,208.39 worth of merchandise shipped to Anderson's enterprises was a transfer in fraud of creditors, and the bankruptcy court's judgment will be affirmed in that particular." Page 17 of Judge Waters' opinion of May 22, 1986.

6. The opinion of May 22, 1986, issued by Judge Waters expressed approval of amounts recovered as preferences or fraudulent transfers.

7. Which is still pending as of this date.

8. "Ordinarily a judgment of reversal rendered by an intermediate appellate court which remands the cause for further proceedings in con-

formity with the opinion of the appellate court is not final and, therefore, not appealable to the higher appellate court." 4 Am.Jur.2d *Appeal & Error* § 59, p. 580 (1962).

9. Further, if all amounts sought in AP 82–882 were recoverable independently as preferences or fraudulent conveyances, the necessity for the appeal may have been obviated.

10. This court regards the findings of Judge Waters as not only supplementing those of Judge Baker, but as superseding them where any conflict exists. Both sets of findings of fact should be regarded as incorporated by reference herein.

introduced (and not refuted) that sales were made to non-Anderson enterprises at mark-ups between 28% and 90%. The picture emerged through the hearing that Ozark was a captive of Anderson and his enterprises, and that the reason for its existence appeared to be to give Anderson enterprises access to equipment at dealer cost or 'just above' because manufacturers like Libby and Hobart would not sell direct to Anderson since they had their own dealers in the Little Rock area."

The trustee also adverted to evidence previously admitted [11] to the effect that, from August 24, 1981, to July 22, 1982, Ozark made sales totaling $75,206.46.[12] She accordingly claims 23% of that amount—the percentage by which the normal markup undershot the "normal" 30%—as a recovery of a transfer or transfers which are fraudulent within the meaning of § 548(a)(2) of the Bankruptcy Code.

She further points to evidence of an unreported pair of transfers which were never entered on the debtor's accounts receivable ledger on which a $4,583.70 markup—based on the "normal" 30%—should have been collected[13], other direct transfers from suppliers to Port City Equipment Co. in the sum of $560.60[14]; and to evidence that Gonzales—and—Gertrude's an Anderson-related entity[15], purchased $65,000 at a markup of only 10%.[16] She therefore claims 20% of $65,000, or $13,000.

■ The defendants, on the other hand, in the hearing of November 25, 1986, offered expert evidence which tended to show that 30% was not the "normal" markup of restaurant equipment during the time periods in question. A brief synopsis of that testimony is as follow:

*Don Downs* testified that he had owned a restaurant supply and equipment business for 15 years; that his company had sold Port City Equipment Co. primarily glassware for ten years; that volume discounts were regularly granted; that a 50 case order of glassware might sell for cost plus 10% while a 100–case order would sell for cost plus 5%; that he doesn't "try to arrive at an average mark-up for overall business"; and that he was unaware of any "established markup in the trade." On cross-examination, he stated that nonglassware products were generally subject to higher markups than strictly glassware products; and that, in figuring cost, he did not include salaries, rent or advertising but rather only the wholesale purchase price and freight.

*Dave Wood* testified that he had 15 years' experience in restaurant supply; that he has done extensive business with the Anderson entities and is familiar with Port City Equipment Company; that not the same markup is charged to high volume buyers; that there are "several customers" with respect to which the markup ranges 10–15%; that sometimes sales are made at near cost in reliance on potential rebates from suppliers; that volume buyers who pay 10–15% markup usually pay freight and taxes; and that "cost plus 10%" is "common in the industry".

*Charles Hughes* testified that he was formerly vice president of Dixie Equipment Co., then the largest volume dealer in the State of Arkansas; that, in the capacity, he was "privileged to do business with Mr. Anderson many times"; that there was "no fixed or average percentage" markup and it "depended on volume"; that he had "done it as low as 5% before"; that he has not been in the trade since 1978; that markups could go as high as 35.40%; and that at least some

11. See exhibit #21 in Volume II, p. 111.

12. The only exception taken to this total by defendants is considered and rejected by this court at page 7, *infra,* of the text of this memorandum.

13. See page 177 of Vol. II of the transcript containing testimony to the effect that Port City

received $13,855 and $1,424 in supplies never reported on the debtor's accounts receivable ledger.

14. See page 177; Vol. II.

15. See note 1, *supra.*

16. See page 174, Vol I.

low markup selling is prompted by rebates obtainable from manufacturers.

The court, in assessing the weight to be accorded this testimony, does not believe that it effectively contradicts the expert testimony presented in the hearing before Judge Baker to the effect that a markup of 30% is necessary to success in the trade. The testimony of these new witnesses was almost self-consciously steered away from the level of general markup which was customary or necessary and instead devoted to special circumstances situations involving great volume or the potential of rebates or the cultivating of new business. Further, these witnesses were all involved to a greater or less degree in trade relationships with Port City Equipment Co. or other Anderson-related entities. This court, therefore, is compelled to find in consonance with the testimony formerly rendered before Judge Baker to the effect that a 30% markup is normal and necessary and establishes the reasonable value of the equipment sold to Port City Equipment Co. Other testimony presented in the hearing of November 25, 1986, did not appear to bear credibly upon the critical issues in this case.[17]

### Conclusions of Law

The issues which are thus presented to this court for resolution are whether sales to Anderson-related entities during the period dating from April 1981 to July 1982 in some manner conferred value upon the defendants, or some of them[18], which can be recovered by a bankruptcy trustee as fraudulent transfers within the meaning of § 548(a)(2) of the Bankruptcy Code. That section provides as follows:

"The trustee may avoid any transfer of interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within a year

before the date of filing of the petition, if the debtor ... received less than a reasonably equivalent value in exchange for such transfer or obligation, and ... was insolvent on the date such transfer was made ..."

There was no palpable factual question that the challenged transfers were made within one year of the date of bankruptcy (August 24, 1982). Similarly, the evidence is without contradiction that the debtor was insolvent throughout this time period.[19] The principal legal question is that which Judge Waters has posed as follows in his order of remand of May 22, 1986:

"It is ... unclear whether property transferred to a third party is fraudulent within the scope of § 548(a)(2)(A) where the property was sold at 80% of retail value, and above cost."

"Whether a transfer is for "reasonably equivalent value' in every case is largely a question of fact; as to which considerable latitude must be allowed to the trier of facts." 4 Collier on Bankruptcy ¶ 548.09, pp. 548–105, 548–106 (15th ed. 1986). The courts must be particularly keen to compare what might have elsewhere been obtained as consideration. See *Klein v. Tabatchnick*, 610 F.2d 1043 (2d Cir.1979). This differs according to the circumstances of the case. There is no particular percentage of value which exempts the transfer from coming within § 548(a)(2), *supra*. A payment of 85% of true worth has been held not, under some circumstances, to insulate the transfer from avoidance as to the other 15%. See, e.g., 4 Collier on Bankruptcy ¶ 548.09, p. 548–107 (15th ed. 1986). See also *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir.1980) (70%); *Matter of Perry, Adams and Lewis Securities Co.*, 30 B.R. 845, 848 (Bkrtcy.W.D.Mo. 1983), affirmed, Civil Action No. 83–0692–CV (W.D.Mo. Apr. 17, 1984) loss of $30,000

---

**17.** If it bore on issues other than those discussed above, it is dealt with on page 10, *infra*, of the text of this memorandum.

**18.** See p. 10, *infra*, of the text of this memorandum.

**19.** See note 3, *supra*. Defendants argue that such evidence only establishes intermittent in-

solvency and does not show insolvency on the precise dates of each challenged transfer. But this evidence justifies an inference of continual insolvency throughout the time period, particularly when it shows a progress toward deeper and deeper insolvency and when there is no contradictory evidence of solvency.

in interest over 20 years when interest charged debtor's insider was 3% per annum less than could otherwise be obtained); cf. *Matter of Fountain*, 32 B.R. 965, 967, n. 5 (Bkrtcy.W.D.Mo.1983) ($4,000 equity lost by foreclosure). This court believes that these authorities warrant the recovery of the excess 23% gained by the transferees at bar, for which *no* consideration was paid. The trustee does not seek to recover that portion of the transfer for which fair consideration has been paid.[20] This court therefore concludes that she is entitled to the recovery which she seeks.

### The Appropriate Amount of Recovery

Evidentiarily, the facts adverted to by plaintiff as to the appropriate amount of recovery are not contradicted. But defendants, in their posttrial brief, contend that some $19,905.39 must be subtracted from the total transferred to Port City Equipment Co. as being part of the sum of $20,208.39 for which judgment was rendered in AP 82–883. But the documentary evidence before the court purports to show that the amounts on which the trustee bases her recovery include no amount transferred on July 22, 1981, the date on which Judge Baker found the $20,208.39 transfer to have been made.

The defendants further contend in their posttrial brief that plaintiff did not sustain her burden to demonstrate that these transfers were of those types of supplies on which a markup of 30%, rather than the lower rates to which one witness testified, were characteristic of glassware. But this point is adequately answered by reference to the testimony of prior witnesses, including two defendants[21], who testified that a 30% markup across the boards would have been necessary to survival in the trade. It is a reasonable inference therefrom that the goods could elsewhere have been sold at a 30% mark-up.

The defendants next assert that the items totalling $4,583.70 are not demonstrated by the plaintiff to have been sold within the year next preceding bankruptcy. In respect of such sales which were not even placed on the ledger of the debtor, the transfer cannot be regarded as complete— or perfected—until the date next preceding the date of bankruptcy, because of the failure to make or record within the preceding time period any appropriate markup.[22] "For the purposes of this section, a transfer is made when such transfer becomes so far perfected that a bona fide purchaser from the debtor against whom such transfer could have been perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, *but if such transfer is not so perfected before the commencement of the case, such transfer occurs immediately before the date of the filing of the petition.*" § 548(d)(1) of the Bankruptcy Code. (Emphasis added.) *And further, with respect to these amounts, the trustee has an obvious alternative ground of recovery as a matured contract right under § 542(b) of the Bankruptcy Code as to which no time limit applies as under § 548, supra.*

The defendants next state that the basis for the $65,000 sale to Gonzales—and—Gertrude's derives from testimony to the effect that "$65,000 to $70,000" was the "amount owed to Ozark Restaurant Equipment by Port City Equipment, Gonzales—and—Gertrude's, and any other *Anderson Controlled companies*" (Emphasis added.) The prior relevant findings made by Judge Waters in his opinion of May 22, 1986, were to the effect that "sales to Anderson-related enterprises" at below 30% markup were "[p]art of the problem." In this context, it makes little difference whether the money was owed by Gonzales and Gertrude's or other related entities. In either instance, for the reasons above stated, the trustee

---

20. Which *could* have been done, subject to the transferee's rights under § 548(c) to retain the value actually paid, if paid in "good faith"—an element which *may* have been difficult to establish in these cases.

21. Kenneth Eads, p. 69, Vol. I.; Robert Whiteley, p. 11, Vol. II.

22. In fact, the transfers were not recorded in the ledger at all. See n. 13, *supra*.

has a basis for recovering the uncollected markup under § 548 or § 542(b).

Therefore, this Court accepts the trustee's contentions, both as to the right to recover and the amounts upon which that right is predicted—with one minor point as to calculation of the markup. Judge Waters found in his opinion of May 22, 1986, that, "[i]n sales to Anderson-related entities ... Ozark collected only 7% over cost" whereas "one needs to average a 30% mark-up on a combined line of hard and soft good to make a profit." The trustee accordingly calculates the markup due her simply by multiplying 23% times the amount of each sale. She accordingly requests .23 x $75,206.46 or $17,297.49 on the basis of the transfers first above mentioned and .20 x $65,000 or $13,000 on the basis of the so called Gonzales and Gertrude's sales. But this does not give credit for the 7% and 10% already having been charged. The elements of recovery thus requested by the trustee are as follows:

| | | |
|---|---|---|
| (1) | 23% of $75,206.46 | $17,297.49 |
| (2) | 30% of $13,855. + $1,424 | 4,583.70 |
| (3) | Supplies direct to Port City | 560.60 |
| (4) | 20% of $65,000 | 13,000.00 |
| | Total | $35,441.79 |

But, according to the court's view, the 23% should be figured on a principal amount of $70,286.41 (after subtracting the 7% already charged) and the 20% on a principal amount of $58,500 ($65,000 less the $6,500 markup already charged). The recovery thus calculated by the court is as follows:

| | | |
|---|---|---|
| (1) | 23% of $70,286.41 | $16,165.87 |
| (2) | 30% of $13,855 and $1,424 | 4,583.70 |
| (3) | 20% of $58,500 | 11,050.00 |
| (4) | Supplies direct to Port City | 560.60 |
| | Total | $33,360.17 |

*The Parties Who are Liable*

■ The named defendants in AP 82–882 are Bruce Anderson, Elmer Dale Yancey, Kenneth Eads, Robert Whiteley and

Anderson Cajun's Wharf. As observed above, they have been previously shown by the evidence to be the "Anderson-related entities" who benefitted from the transfers.[23] Further, in the hearing of November 25, 1986, the defendant Bruce Anderson volunteered testimony which identified the named defendants with the transferee entities and which also demonstrated that these entities were utilized as the defendants' mere instrumentalities. He testified that the debtor entity would be used because at least one of the manufacturers—Libby—would sell only to Ozark and not to the other related entities; that he placed Eads and Whiteley in their positions with the Port City entities, that he discussed with them the markup procedure; that a "you-don't-charge-us-we-won't charge you" type of arrangement was involved; that he had the power to dismiss the other defendants and in fact dismissed the defendant Eads shortly before bankruptcy[24]; and that he dictated the sale of certain equipment through another entity when he felt the bank was about to "shut down" the Port City entities. This testimony, and that previously adduced, clearly shows the defendants to be so intertwined with the nominal transferees that the transfers must be regarded as having been for their benefit. "Where a corporation is no more than an instrumentality of [other entities] ... it is appropriate to treat the [other entities] as titleholder[s] of the corporation's property." 4A Collier on Bankruptcy § 70.15[2], p. 138, n. 14 (1978).

*Judgments to be Separate*

In accordance with governing procedural rules, judgment in accordance with the foregoing findings of fact and conclusions of law will be entered on a separate document which will be transmitted to the clerk for filing. In the event of any appeal from or other review of that judgment, it shall be the duty of the appellant to type this memorandum of findings of fact and

---

**23.** See note 1, *supra.*

**24.** Although he contends that he effected the dismissal by giving instructions to fire Eads to another functionary.

conclusions of law and present them to the court for signature.